<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BK ENTERTAINMENT GROUP, INC.,<br><br>                 Plaintiff,<br><br>vs.<br><br>DAVID BENDETH,<br><br>                 Defendant. | Civil Action No. 11-cv-06432 (SRC)(CLW)<br><br>**<u>OPINION</u>** |

**<u>WALDOR</u>, Magistrate Judge,**

This matter comes before the Court upon the motion filed by Defendant/Counterclaimant David Bendeth (hereinafter "Defendant or "Bendeth") for an Order amending the scheduling order, and permitting him leave to amend his answer to assert a "statute of limitations" affirmative defense in response to a November 1, 2011 complaint ("Complaint") filed by Plaintiff, The BK Entertainment Group, ("Plaintiff" or "BKEG), which seeks to enforce a purported oral agreement between these two parties. The Court has considered the submissions made in support of and in opposition to Defendant's motion and decides the matter without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons expressed below the Court denies Bendeth's application.

**I. Background**

This action arises from a dispute between Defendant David Bendeth, a music industry producer who has worked with a number of commercially successful music artists including

Papa Roach, Paramore, Red Jump Suit Apparatus, and Breaking Benjamin, and his former manager Bennett Kaufman ("Kaufman") the sole owner of the BK Entertainment Group.  From 1998 to 2002, Bendeth was managed by Moir-Marie Entertainment ("MME") pursuant to a written agreement.  MME was owned and managed by Lisa Marie and Steve Moir, and housed as clients some of the biggest mixers and producers in the world.  MME also employed Kaufman who was assigned to manage some of the day to day aspects of management which included negotiating specific deals for Bendeth.  In mid-2005, Lisa Marie and Steve Moir, who were romantically involved, ended their relationship, and also began to split up the company.  At that time, Kaufman left MME and started BKEG, and approached Bendeth about signing with the newly formed BKEG.  Despite expressing some initial reservations about Kaufman's perceived inexperience, Bendeth decided to join BKEG.  In June or July 2005, Kaufman drafted and sent to Bendeth two drafts of a management agreement for Bendeth to execute.  Bendeth insists that he refused to sign the draft agreement because he objected to paying a commission on his songwriting/publishing royalties and the perpetual commissions provision.  Bendeth contends that the parties only agreed that BKEG would find Bendeth new projects, negotiate deal memos and agreements, review Bendeth's royalty statements for accuracy, and ensure that Bendeth was properly paid.  Instead, Kaufman and Bendeth reached an oral agreement as to the terms of their new business relationship.  This oral agreement was never reduced to writing, and because BKEG and Bendeth never formalized their agreement, there is a dispute as to its terms.  The parties operated under this oral agreement from 2005 until March 14, 2008, at which point Bendeth terminated the agreement. The parties agree that Bendeth had the right to terminate the contract upon 30 days' notice. For several months after termination, Bendeth continued to make payments to BKEG. Bendeth ceased making payments in December 2008.

**II. Procedural History**

On November 1, 2011 BKEG filed a complaint ("Complaint") with the United States District Court for the District of New Jersey seeking to enforce the purported contract between BKEG and Bendeth, claiming that BKEG would serve as Bendeth's music industry manager in exchange for a 15% commission, in perpetuity, on the gross income received from Bendeth's musical songwriting, publishing, and production. In the Complaint, BKEG asserts claims of breach of contract and unjust enrichment and seeks the payment of commissions on royalties and other revenue Bendeth received in the performance of his duties as a record producer. Notably, the Complaint alleges that the "action arises under New Jersey common law", and does not allege that the contract later produced during discovery embodied the terms of the oral agreement. Rather, the Complaint recites as the "relevant" terms of the oral agreement:

> BKEG would receive fifteen-percent (15%) of the gross income (including without limitation royalties) that Bendeth earned as, inter alia, a producer, mixer, arranger and recording engineer over the life of the Contract. The 15% commission was to be paid in perpetuity for any royalties generated from any Covered Bendeth Project.

(Complaint, D.E. No. 1, at ¶21).

Bendeth filed his answer and counterclaim ("Answer") on January 31, 2012 admitting the existence of the oral agreement, but disputing its terms. (Answer, Docket Entry No. 7 at ¶21). The Answer further asserted eleven separate affirmative defenses, but omitted a statute of limitations defense.

On March 29, 2012, then-Magistrate Judge Shipp held a preliminary conference and entered a scheduling order which set an August 22, 2012 deadline for any motion to add new parties or amend any pleading.

Discovery commenced, and on May 30, 2012, Kaufman certified his responses to Defendant's first set of interrogatories and document requests on behalf of BKEG. Therein, BKEG produced approximately 4032 documents responsive to those requests. Among those documents was a two-page unsigned agreement addressed to Bendeth from BKEG. That agreement, dated July 16, 2005 and bates numbered 4031 and 4032, allegedly reflected the terms of the oral agreement upon which Bendeth and BKEG would ultimately agree. Among other terms, the unsigned agreement contained a choice of law provision deeming California law as the controlling law for the interpretation and construction of the agreement. However, the answers to the interrogatories and document requests did not claim that the terms of this unsigned agreement were the terms of the alleged oral agreement, rather, the document was produced as responsive to the request for "Documents and communications that concern or evidence any *draft* management agreements exchanged between the parties…." (emphasis added). A separate request, request number 7 asked for "Documents and communications that concern or evidence the terms of the alleged Contract," to which, following a general objection, BKEG responded, "See documents numbers 19-4005." Despite this large and unspecific range of documents identified to be responsive, at no time did Bendeth move to compel more specific answers to the interrogatories or ask that BKEG point to a more specific range of documents that would identify the terms of the alleged oral agreement.

Shortly thereafter, but still before the deadline to file a motion to amend the pleadings, on June 26, 2012 Judge Shipp held a settlement conference with the parties. At this conference Bendeth's counsel raised the argument that BKEG's allegations were meritless because the oral agreement would be barred by California's statute of frauds.

Discovery continued, and both Bendeth and Kaufman were deposed. In both depositions, the questioning appeared to reflect an apparent concern as to where many the events leading to the oral agreement occurred, an indication that choice of law concerns could be an issue in the case. For Plaintiff, is was important to show that many of the events and discussions occurred while Bendeth was at home in Montclair, New Jersey in order to establish a New Jersey nexus.

On March 25, 2013, Bendeth filed his motion for summary judgment arguing that the oral agreement was governed by California law, and as such, the California statute of frauds barred the enforcement of that agreement. On April 25, 2013 BKEG filed its response in opposition. In his motion, Bendeth argues that BKEG's judicial admission that it seeks to enforce the terms of the unsigned written agreement that contains a California choice of law provision is a basis for the application of California law. In opposition, BKEG argued that the Court ought to apply New Jersey law because significant activity occurred in the state, but in any event, even if California law applied, the statute of frauds did not bar the enforcement of this agreement.

On July 22, 2013, the District Court issued an opinion finding that California law governed the party's agreement because of the choice of law provision contained therein, and that the California statute of frauds did not preclude enforcement of the oral agreement.[1] Thus, the motion for summary judgment was denied on these counts.[2]

---

[1] Defendant appears to read Judge Chesler's opinion as expressly finding that California law will govern the alleged agreement, *see* Def.'s Br., Docket Entry No. 40-5, at 9, but this Court disagrees. Judge Chesler's opinion applied the exacting summary judgment standard which construed all disputed material facts in favor of the non-moving party. Bendeth, the moving party, disputes agreeing to the terms contained in the unsigned draft agreement, while BKEG, the non-moving party, argued, in essence, that Bendeth capitulated and agreed to the draft agreement wholesale. As a disputed material fact, Judge Chesler construed this fact in favor of BKEG, to wit, for purposes of summary judgment Bendeth had orally agreed to each and every written

### III. Bendeth's Position

As a result of Judge Chesler's summary judgment decision, Bendeth now moves to amend the scheduling order so that he may be permitted to amend his answer to assert the California statute of limitations as an affirmative defense. Bendeth's motion first argues that good cause exists under Fed. R. Civ. P. 16 to amend the scheduling order, because BKEG failed to provide properly plead, or provide during discovery, information sufficient to put Bendeth on notice that the BKEG's claim was that Bendeth orally accepted the terms of the unsigned draft agreement. Specifically, Bendeth argues that BKEG did not allege that Bendeth had orally accepted the terms of the draft management agreement, that the terms of the draft management agreement controlled, or even attach the document as an exhibit. Def.'s Br. at 11. Further, Bendeth argues that during discovery and in response to Bendeth's interrogatories and document requests, BKEG failed to identify the draft agreement as being the terms of the contract. Id. at 11-12. These factors, Bendeth argues, justify good cause to amend the schedule ding order.

Bendeth further argues that he should be permitted to amended his answer under Fed. R. Civ. P. 15 because there is no indication of bad faith or undue delay, there is no prejudice to BKEG, the amendment is not futile and the interests of justice favor the amendment. Primarily, Bendeth asserts that applying the California statute of limitations to this claim would render it time barred. That is because the California statute of limitations, unlike New Jersey's, provides for only a two-year period to assert a claim for breach of an oral agreement. See Cal.Code

---

term in the draft agreement. The facts, as they stood for summary judgment, therefore included a choice of law provision that stated that the agreement would be governed by California law. This does not change the fact that should this matter proceed to trial, BKEG will, as the Plaintiff asserting an oral agreement, have the burden to show not only that Bendeth orally agreed to terms, but must also demonstrate the contours of that alleged agreement, which necessarily will include the acceptance of, or capitulation to, the choice of law provision.

[2] Judge Chesler granted Summary judgment on the unjust enrichment counts.

Civ.Pro. § 339. Bendeth argues that depriving him of the opportunity to assert the statute of limitations would unjustly deprive him of the opportunity to present this statutory bar to enforcement of the alleged agreement.

**IV. BKEG's Position**

BKEG's opposition focuses primarily on its perceived lack of diligence exercised by Bendeth during the course of discovery and through summary judgment. BKEG argues that long before Bendeth filed this motion, he was well aware that California law might apply, and in fact argued in his summary judgment brief that it should. In that brief, Bendeth argued that New Jersey's choice of law principles favored applying California law because: "BKEG was based in California, drafted the proposed written agreement in California, agreed to the contract in California, and (allegedly) performed all management services, the services at issue in the contract, from California." Pl.'s Br. at 11. Because these facts were available to Bendeth long before he filed this motion, and because Bendeth himself argued for the application of California law, BKEG's position is that there is no good cause to amend the scheduling order at this late date.

BKEG further argues that even if this Court were to find good cause to amend the scheduling order, they would be prejudiced by allowing this amendment. Although BKEG agrees that the California statute of limitations is two years for the breach of an oral agreement, it disagrees with the date calculations put forth by Bendeth. BKEG argues that "the accrual of a cause of action is postponed until the plaintiff discovers, or has reason to discover the claim." A.B.H. Investments Inc. v. Narven Enterprises, Inc., 2003 WL 22796049, at *8 (Cal. Ct. App. Nov. 25, 2003). BKEG believes that the discovery of the breach, should a statute of limitations defense be permitted, would need further exploration with additional fact discovery, specifically

Bendeth's re-deposition, and an additional deposition of Bendeth's business attorney. Because accrual of the cause of action would be a central issue, BKEG believes that this discovery would be necessary and warranted, and would necessitate further dispositive motion practice on the two questions of accrual and applicability of the statute of limitations. BKEG believes that permitting the amendment would therefore result in significant prejudice to it.

**V. Discussion**

*Amendments to the Scheduling Order Under Rule 16*

Rule 16 authorizes courts to enter schedules for proceedings. Rule 16(c) identifies a list of events that a court controls, including amending pleadings and completing discovery. The pretrial scheduling order allows a court to take "judicial control over a case and to schedule dates for completion by the parties of the principal pretrial steps." Harrison Beverage Co. v. Dribeck Importers, Inc., 133 F.R.D. 463, 469 (D.N.J. 1990) (quoting Fed. R. Civ. P. 16, Advisory Committee's Note on 1983 Amendment). Moreover, "to argue that there should be a liberal policy of freely permitting amendments is to ignore . . . the purposes of case management and the scheduling orders which 'are at the heart of case management.'" Harrison, 133 F.R.D. at 469 (quoting Koplove v. Ford Motor Co., 795 F.2d 15, 18 (3d Cir. 1986)).

Under Fed. R. Civ. P. 16(b)(4), modification of a scheduling order occurs "only for good cause and with the judge's consent." See, e.g., E. Minerals & Chems. Co. v. Mahan, 225 F.3d 330, 340 (3d Cir. 2000) (finding no abuse of discretion where District Court denied amendment of complaint requested after deadline in the scheduling order given absence of good cause and unexplained delay). Allowing extensions in the absence of "good cause" would "deprive trial judges of the ability to effectively manage the cases on their overcrowded dockets" and severely impair the utility of scheduling orders. Koplove, 795 F.2d at 18. As Retired Chief Judge Brown

previously recognized, "good cause may be satisfied if the movant shows that their delay in filing the motion to amend stemmed from 'any mistake, excusable neglect or any other factor which might understandably account for failure of counsel to undertake to comply with the Scheduling Order.'" Philips, 2006 WL 3069475, at 6*.  Further, the party seeking to adjust a scheduling order must also show they acted with diligence.  As the advisory committee observed, "the court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."  Fed. R. Civ. P. 16, Advisory Committee Note (1983).  Thus, "[a]bsent diligence, there is no 'good cause.'" Chancellor v. Pottsgrove Sch. Dist., 501 F. Supp. 2d 695, 702 (E.D. Pa. 2007).

Here, Bendeth seeks to amend the Scheduling Order at this late date arguing that BKEG's failure to properly plead or adequately indicate during discovery that it intended to enforce an oral capitulation to the unsigned written agreement's terms failed to place Bendeth on notice that California law might apply.  However, Bendeth's arguments here are doomed by his own arguments at summary judgment.  Importantly, Bendeth then argued in point one of his brief filed on March 25, 2013 that "The Court Should Apply California Law …." Def.'s Br. in Support of Motion for Summary Judgment, D.E. No. 26 at 9.  Bendeth continued, "[BKEG]'s testimony that the parties had agree to be bound by the terms and conditions of an unsigned draft agreement which contains a California choice of law provision constitutes a judicial admission which prohibits it from claiming that any other law other than California law should apply."  Id.  This statement clearly indicates Bendeth's awareness that BKEG sought to enforce an agreement with a California choice of law provision.

This Court will generously grant leave to amend a scheduling Order in many instances where the good cause standard is met.  However, this is not one.  Good cause may be satisfied if

the movant shows that their delay in filing the motion to amend stemmed from any mistake, excusable neglect or any other factor which might understandably account for failure of counsel to undertake to comply with the Scheduling Order. Counsel for Bendeth has not pointed to any excusable oversight that would justify permitting them to amend the scheduling order at this late juncture. Rather, counsel for Bendeth seeks the Court's indulgence to revisit a failed strategic decision, and take another bite of the apple. Bendeth's summary judgment brief sought the application of California law for purposes of deciding whether California's statute of frauds barred enforcement of this agreement. Similarly, in his Answer, Bendeth included the affirmative defense of statute of frauds. At any of these earlier points, Bendeth could have sought to assert a statute of limitations defense as well. Only now, after that strategy has failed, does it seek to do so. This is not good cause, and the Court will deny Bendeth's application to amend the scheduling order for failure to show good cause.

*Amendments to Pleadings Under Rule 15*

Even assuming that good cause did exist, the Court would deny the Defendant's request to amend his answer under Fed. R. Civ. P. 15. See Long v. Wilson, 393 F.3d 390, 400 (3d Cir. 2004) (stating "[t]he plain terms of Rule 15(a) do not discriminate on the basis of type of pleading. The liberal right to amend extends to an answer to the complaint"). Rule 15 provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Granting or denying leave to amend a pleading is within the Court's discretion. Foman v. Davis, 371 U.S. 178, 182 (1968). The Court may deny leave to amend a pleading if it finds "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." Foman, 371 U.S. at 18.

While incidental prejudice and incidental delay are insufficient grounds on which to deny leave to amend, undue prejudice or undue delay are sufficient for a denial. Harrison, 133 F.R.D. at 468. In cases of delay, the movant must show that "its delay in seeking to amend is 'satisfactorily explained.'" Id. (quoting Leased Optical Dep'ts v. Opti-Ctr., Inc., 120 F.R.D. 476, 478 (D.N.J. 1988). As the Court of Appeals for the Third Circuit has explained that:

> [t]he passage of time, without more, does not require that a motion to amend a [pleading] be denied; however, at some point, the delay will become "undue," placing an unwarranted burden on the court, or will become "prejudicial," placing an unfair burden on the opposing party. The question of undue delay, as well as the question of bad faith, requires that we focus on the [movant's] motives for not amending their [pleading] to assert this claim earlier; the issue of prejudice requires that we focus on the effect on the [adverse party].

Adams v. Gould, Inc., 739 F.2d 858, 868 (3d Cir. 1984) (internal citations and internal quotation marks omitted).

As noted above, Bendeth waited almost a year after the filing of its summary judgment brief, and over a year after learning that BKEG sought to enforce the terms of the unsigned written agreement. Given the earlier opportunities to assert a statute of limitations defense, the adjudication of summary judgment wherein Bendeth sought to have the Court apply California law, and the filing of a final pretrial order prior to filing this application, this, to the Court, appears to fit the very definition of undue delay. Thus, even if the Court were to have found good cause to amend the scheduling order, the Court would deny the motion to amend based on Bendeth's undue delay in filing its motion to amend.

- 12 -

## VI. Conclusion

For the reasons expressed above the Court denies Bendeth's application to amend his answer to assert the affirmative defense of statute of limitations [ECF No. 40].  An order accompanies this decision.

s/ Cathy L. Waldor
**CATHY L.WALDOR**
**UNITED STATES MAGISTRATE JUDGE**
